# United States District Court
# Northern District of Indiana
# Hammond Division

| | |
|---|---|
| LESLEY GENTRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:06-CV-414 JVB |
| v. ) | |
| ) | |
| WHOLE FOODS MARKET GROUP, INC., ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

### A. Introduction

Plaintiff Lesley Gentry was an employee of Defendant Whole Foods. During her employment, Plaintiff alleges she was subjected to repeated sexual harassment by one of her produce department supervisors, Michael Perez. Having resigned from the job in December 2005, Plaintiff now brings five tort claims against Defendant, federal claims of sexual harassment and retaliation, as well as state claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract. All of Plaintiff's claims are directed at Defendant Whole Foods, and not at Mr. Perez. Defendant has responded by requesting summary judgment in its favor on all five claims. Plaintiff responded to Defendant's summary judgment motion on July 6. Defendant moved for an extension to July 30 to file a reply to Plaintiff's response, but did not file the reply by that date or request a further extension.

### B. Standard of Review

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628.. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v.*

*Liberty Lobby*, 477 U.S. 242, 249–50 (1986).

**C. Facts**

On June 9, 2003, Plaintiff was hired by the Whole Foods distribution center in Munster, Indiana. (DE 55, Resp. Mot. Summ. J. at 2.) Plaintiff worked in the produce department with five other employees, including department team leader Arcadio "Michael" Perez. (*Id.*) As team leader of the produce department, Mr. Perez was Plaintiff's direct supervisor. (*Id.*) Mr. Perez's supervisor was Lawrence Priest, "associate team leader" and the second-highest-ranking member of the distribution center at the time. (*Id.* at 2-3.)

Plaintiff notes that Defendant provided employees with an employee handbook, which listed and described certain employer and employee rights and obligations governing the employer-employee relationship. (DE 1 at 7.) The employee handbook includes matters related to sexual harassment, prohibiting any form of harassment that has the purpose or effect of unreasonably interfering with an individual's work performance, or that creates an intimidating, hostile, abusive, or offensive work environment. (*Id.*) The policy provides that team leaders, or anyone else notified of a harassment complaint, will refer all complaints to the appropriate employee, and an immediate, thorough, and objective investigation will take place. (*Id.*) The policy explicitly provides that employees will be protected against retaliation upon complaining about a sexual harassment incident. (*Id.*) Finally, the policy provides that if a complaint is made, appropriate and effective action appropriate to the circumstances will be taken, including measures to deter any future harassment. (*Id.* at 8.)

In December 2003, Plaintiff confronted Mr. Perez in the office they shared together

3

regarding his behavior toward her, which she considered to be inappropriate. (DE 49-7, Ex. Def.'s Statement of Facts at 4.) Some time in January 2004, Plaintiff again approached Mr. Perez, this time in the Whole Foods break room, about what she considered inappropriate behavior toward her. (*Id.* at 3.) She requested that he stop. (*Id.*) Mr. Perez told her he was only joking around, then laughed and walked away. (*Id.*) Later the same month, Plaintiff reported to Mr. Priest, Mr. Perez's supervisor, that Mr. Perez was sexually harassing her. (*Id.* at 2-3.) Plaintiff reported that the sexual harassment by Mr. Perez included phone calls on her days off, including weekends, over non-work related matters; incidents in which Mr. Perez approached her from behind and hugged her; incidents in which Mr. Perez played with her hair; and incidents in which Mr. Perez told Plaintiff that he was having sexual dreams about her. (*Id.* at 3.) In response, Mr. Priest told Plaintiff that he would speak with Mr. Perez about his behavior. (*Id.*)

Between January 2004 and June 2005, Mr. Perez's behavior did not stop, according to Plaintiff, but rather occurred at a frequency of about once every other day. (*Id.* at 4.) Plaintiff frequently asked Mr. Perez to stop when he behaved in such a manner toward her. (*Id.* at 6.) At other times, she remained silent. (*Id.*) At some point during this time span, she requested that she be moved upstairs to another department, but the request was met with "indifference."(*Id.* at 9-10.) Mr. Priest explained to Plaintiff that Whole Foods would be hiring more people soon, and needed to reserve the empty cubicles in the building for the new employees. (*Id.* at 10.)

In June 2005, Plaintiff reported Mr. Perez's behavior for a second time to Mr. Priest, delivering her complaint in a hand-written letter. (DE 49-7 at 1.) The letter contained several specific allegations, including: that Mr. Perez pulled up her underwear as she was filing papers; that Mr. Perez placed her in "bear hugs"; that Mr. Perez played with her hair; that Mr. Perez told

4

her that he could see down her shirt; that Mr. Perez threw produce at her; that Mr. Perez called her on her personal cell phone when she was not at work, including on weekends; and that Mr. Perez showed her sexually explicit materials on his computer. (*Id.*) Mr. Priest informed Plaintiff that he would put a letter in Mr. Perez's file, that he appreciated her bringing the matter to his attention, and that he would have a talk with Mr. Perez. (*Id.* at 10.)

In either late June 2005 or early July 2005, about a week after Plaintiff's hand-written report to Mr. Priest, Mr. Perez conducted a three-minute team meeting with the produce department. (*Id.* at 11.) Plaintiff was in attendance, along with three male department members. (*Id.*) At the meeting, Mr. Perez explained that, since Plaintiff was the only female in the office, other workers needed to begin acting more appropriately and watching their language around her. (*Id.*) According to Defendant, Mr. Perez held the meeting at the advisement of Mr. Priest. (DE 45, Mem. Supp. Def.'s Mot. Summ. J. at 3-4.) Plaintiff was embarrassed by the meeting because she was the only female employed in the produce department, and felt uncomfortable while it was taking place. (DE 49-7 at 12.)

From June 2005 to September 2005, Mr. Perez continued to sexually harass Plaintiff. (*Id.* at 11.) Mr. Perez continued to give Plaintiff unwanted hugs and to show her inappropriate images on his computer. (*Id.*) He would hand her pieces of paper with prices on them, on which he had also drawn pairs of female breasts. (*Id.*) During this time, Plaintiff did not approach any other supervisors about Mr. Perez's behavior, and Whole Foods took no further action. (*Id.* at 11.)

On September 28, 2005, Plaintiff asked Mr. Perez for the price of a produce product. (*Id.* at 13.) Mr. Perez responded by pulling the drawstring on her pants. (*Id.*) Plaintiff slapped Mr.

5

Perez's hand away, and Mr. Perez then slapped her buttocks when she turned around. (*Id.*)

Plaintiff, along with co-worker Michelle Bruner, reported the incident to Erin Egan of the human resources department. (*Id.*) Ms. Egan informed Plaintiff that she would investigate the incident, and asked Plaintiff if she wanted to confront Mr. Perez directly. (*Id.* at 14.) Plaintiff declined. (*Id.*) Plaintiff went to Ms. Egan rather than Mr. Priest with her complaint this time because she did not feel that Mr. Priest acted sufficiently to correct the ongoing problem the previous times that she reported Mr. Perez's behavior to him. (*Id.*) Ms. Egan and Mr. Priest then informed Plaintiff that Mr. Perez wanted to apologize to her. (DE 55 at 5.) Defendant claims that at this point, after Mr. Priest consulted with the Whole Foods regional human resources department, that Mr. Priest decided to issue a "final work warning" to Mr. Perez. (DE 45 at 4.)

On September 29, 2005, Plaintiff did not report for work. (DE 49-7 at 15.) She called Ms. Egan to inform her that she would not be coming in, and Ms. Egan authorized her absence. (*Id.*) Mr. Perez called her cell phone three times that day, but she did not return any of his messages. (*Id.*)

On September 30, 2005, Plaintiff reported back to work, but was asked to leave because supervisors were speaking with Mr. Perez and were unsure of what the result of that discussion was going to be. (DE 49-8 at 1.) On the same day, Plaintiff supplied supervisors Ms. Egan and Steve Burse with a comprehensive list of Mr. Perez's behavior. (*Id.*) Plaintiff was then informed that she was going to be moved out of produce and into the shipping and receiving department. (*Id.*) Plaintiff considered this to be a demotion because her desk was to be moved to the back of the building, and she now had to "deal with male truck drivers from the ages of 22 to 25." (*Id.* at 2.) Plaintiff informed Ms. Egan that she felt that it was unfair to move her instead of Mr. Perez.

6

(DE 55 at 6.) Plaintiff had a meeting with Ms. Egan and Mr. Priest. (*Id.*) Mr. Perez was instructed to view the company sexual harassment video for the third time. (*Id.*) Supervisors asked Plaintiff if she would allow Perez to read her a letter of apology. (*Id.*)

On October 3, 2005, Whole Foods fired Mr. Perez. (*Id.*) Defendant says that he was terminated because of Plaintiff's final list documenting the full extent of Mr. Perez's behavior. (DE 45 at 4.)

According to her version of the facts, which must be taken as true when considering a motion for summary judgment, Plaintiff's co-workers began to make work uncomfortable for her after Mr. Perez's firing. (DE 55 at 6.) For example, Chuck Pedrick, a Whole Foods employee, approached Plaintiff and told her that he thought it was unfair that Mr. Perez was fired. (*Id.* at 7.) Other employees also expressed their beliefs that Mr. Perez should not have been terminated. (*Id.*) Plaintiff informed Mr. Priest and Ms. Egan that comments were being made about her by fellow employees in the workplace, but they did "nothing." (*Id.*) In fact, Plaintiff says that Ms. Egan helped advance the rumors. (DE 55 at 13.) Mr. Priest would not answer Plaintiff's work-related questions, was ill-tempered with her, and would not grant her vacation requests, according to Plaintiff. (DE 55 at 7.) Plaintiff says that when she would ask Mr. Priest a work-related question, he would scream and say, "I don't know; figure it out yourself." (DE 49-9 at 2.) Whereas Plaintiff looked forward to work before the sexual harassment began, she now found it stressful to attend work. (DE 55 at 7.)

On November 10, 2005, Plaintiff sent Whole Foods team members an email indicating that she planned to resign effective December 23, 2005. (*Id.* at 8.) Plaintiff resigned from Whole Foods on December 8, 2005. (*Id.*) Plaintiff resigned because of the way she was treated,

7

including the fact that other employees knew what had occurred. (*Id.*) She was embarrassed and miserable as a result. (*Id.*)

**D. Analysis**

Plaintiff alleges five separate claims related to the sexual harassment, and subsequent effects of such, by Mr. Perez.

*(1) Sexual Harassment*

Workplace sexual harassment is divided into two categories: (1) Situations in which a supervisor's harassment resulted in a tangible employment action, such as discharge, demotion, or undesirable reassignment; and (2) Situations in which the harassment did not result in a tangible employment action. *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 765 (1988). In cases which did not result in a tangible employment action, employers can defeat a sexual harassment claim by showing that: (a) The employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior; and (b) The plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. *Id*.

(a) *'Reasonable Care'*

Defendant argues that it exercised reasonable preventative care. (DE 45 at 2-3.) The company enacted and implemented a strong anti-harassment policy through its employee handbook, distribution center policies, training sessions of team leaders, and training of team

members. (*Id.* at 3.) Adopting such a detailed anti-harassment policy and distributing it to employees establishes as a matter of law that an employer has "exercised reasonable care to prevent sexual harassment." *See Shaw v. Auto Zone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999) (Holding that employer exercised reasonable care as a matter of law by distributing an anti-harassment policy and providing for multiple mechanisms for prompt resolution).

Defendant argues that it utilized its strong anti-harassment policy to reasonably correct the alleged harassing behavior when it was brought to its attention. (DE 45 at 3.) For example, Defendant points out that it initiated a complete and methodical investigation immediately following Plaintiff's claims of alleged misconduct, and implemented appropriate responses, including progressive discipline that resulted in the eventual termination of Plaintiff's alleged sexual harasser, Mr. Perez. (*Id.*) Defendant points out that Mr. Priest spoke with Mr. Perez during the first half of 2005, counseling him about the allegation. (*Id.*) At that meeting, Mr. Priest cautioned Mr. Perez to refrain from any inappropriate conduct and advised him to speak to his department as a whole about creating and maintaining an atmosphere of professionalism. (*Id.* at 3-4.) Mr. Priest communicated several times with Mr. Perez about the office environment over several weeks. (*Id.* at 4.)

Defendant notes that, upon being notified in September 2005 that Plaintiff had been subjected to additional inappropriate conduct by Mr. Perez, Mr. Priest and facility leadership again immediately launched an investigation which included soliciting the involvement of the Midwest Regional Office. (*Id.*) That investigation focused initially on the report that Mr. Perez had slapped Plaintiff's buttocks and pulled her drawstrings. (*Id.*) Facility leadership, Defendant notes, interviewed witnesses and took steps to promptly and reasonably stop the harassment,

including issuing a final work warning to Mr. Perez with the caveat that any further misconduct would result in immediate discharge. (*Id.*) Leadership also inquired as to whether Plaintiff was receptive to an apology from Mr. Perez, at his suggestion, and supervisors made arrangements to move Plaintiff's work station and transfer her from Mr. Perez's supervision after she requested to be separated from him. (*Id.*) Defendant points out that when Plaintiff's list of complaints expanded on September 30, 2005, Defendant took immediate steps to terminate Mr. Perez's employment. (*Id.*) Defendant claims that its response to Plaintiff's allegations was "reasonably calculated to prevent further harassment under the particular facts and circumstances," and that it was "successful in [its] outcome through the progressive discipline that resulted in Mr. Perez's termination." (*Id.* 4-5.)

Plaintiff, on the other hand, argues that Mr. Priest "ignored" her complaints regarding Mr. Perez on multiple occasions. (DE 55 at 12.) However, Plaintiff's own deposition testimony reveals a pattern of progressive discipline against Mr. Perez, resulting ultimately in his termination. Thus, Plaintiff's complaints were not ignored, by her own admission. However, a "genuine issue of triable fact" remains because the trier of fact must still determine whether Defendant's progressive discipline of Mr. Perez was "reasonably" calculated to correct his harassing behavior. *Anderson*, 477 U.S. at 249-250. Plaintiff's first formal complaint was made in January 2004. (DE 55 at 3.) Mr. Perez was terminated on October 3, 2005, more than eighteen months after Plaintiff first drew the matter to a supervisor's attention. (*Id.* at 6.) Taking into account the severity and pervasiveness of the alleged behavior by Mr. Perez, a trier of fact may potentially find that Defendant's progressive discipline was not a reasonable attempt to halt the behavior. *See Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 462-63 (7th Cir. 2002).

(b) *'Plaintiff . . . failed to take advantage'*

Defendant argues that Plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." (DE 45 at 5.) For example, "the plaintiff admittedly did not inform facility leadership of any of the alleged inappropriate comments or actions." (*Id.*) Defendant claims that "Whole Foods had no reason to suspect that anything was amiss." (*Id.*) However, Defendant misapplies this step of the test. When Defendant argues that Plaintiff did not inform facility leadership of inappropriate comments or actions, it is referring to comments and actions by employees subsequent to Mr. Perez's firing. The second part of the test, however, is intended to be applied to the sexual harassment itself, not secondary effects of the harassment such as after-the-fact treatment by co-workers or other supervisors. Defendant makes no argument that Plaintiff did not take advantage of preventative or corrective opportunities to halt the alleged sexual harassment by Mr. Perez.

Plaintiff reported Mr. Perez's behavior on several occasions. She first confronted Mr. Perez two or three times before January 2004, hoping that he would cease his behavior without her having to report it to his supervisors. (DE 55 at 3.) When the behavior did not stop, Plaintiff reported it to Mr. Priest. (*Id.*) That was in late January 2004. (*Id.*) When Mr. Perez's behavior continued, Plaintiff repeatedly asked him to stop, and eventually requested a transfer to another department. (*Id.* at 4.) Her request was not granted. (*Id.*) In June 2005, Plaintiff delivered a hand-written letter to Mr. Priest which catalogued Mr. Perez's various violations of the company's sexual harassment policy. (*Id.* at 3-4.) In late September 2005, Plaintiff again reported Mr. Perez's behavior to his supervisors. (*Id.* at 5-6.)

A reasonable fact-finder could find that the Plaintiff did not do enough to take advantage

of the preventative and corrective measures available to her. For example, Plaintiff at one point allowed several months to pass without a second complaint to management, despite the fact that Mr. Perez was acting inappropriately toward her every other day. However, a reasonable fact-finder could also find that she took advantage of the measures available to her, and that she should not have been required to report each incident to Mr. Perez's supervisors in real time. Thus, whether she adequately took advantage of the opportunities available to her to deal with the situation remains a "genuine issue of triable fact" that is best resolved by a jury, not via summary judgment.

**(2)** *Retaliation*

To prove retaliation, a plaintiff must suffer an adverse employment action after engaging in statutorily protective activity. *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir. 2000). Not everything that makes an employee unhappy is an actionable adverse action. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Adverse employment actions are those that result in materially adverse changes in terms, conditions, or privileges of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits. *Ellerth*, 524 U.S. at 761. Defendant argues that the comments made by Plaintiff's co-workers, any silent treatment, and their ostracism do not constitute materially adverse employment actions. (DE 45 at 8.) Harassment by co-workers, according to Defendant, can only rise to a level of retaliation if it is severe enough to cause a significant change in Plaintiff's employment status. (DE 45 at 8, citing *Butler v. Ill. Dept. of Corrections*, 263 F.3d 698, 704 (7th Cir. 2001).)

12

Plaintiff argues that there was a material change in her terms and conditions of employment because: (1) Whole Foods did nothing to help prevent gossip and rumors about her after the sexual harassment, and Ms. Egan advanced the rumors; and (2) Mr. Priest was short and ill-tempered with her, denying simple requests and refusing to answer her work-related questions. (DE 55 at 13.)

Plaintiff does not use the term "constructive discharge" in her pleadings, but that is what the explanation of her resignation amounts to. To prove a constructive discharge, a plaintiff must show that her working conditions were so intolerable that a reasonable person would have been compelled to resign. *Rabinovitz v. Pena*, 89 F.3d 482, 489 (2nd Cir. 1996). An employee who quits without giving her employer a reasonable chance to work out a problem, Defendant argues, has not been constructively discharged. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001). Defendant claims that it had "no idea" that Plaintiff's working conditions were unsatisfactory, and that had Plaintiff acted reasonably, she would have reported any ostracizing conduct by her co-workers with the knowledge that Defendant would have responded effectively. (DE 45 at 6-7.)

However, Plaintiff disputes this version of the facts. Plaintiff claims that she reported to Mr. Priest and Ms. Egan that comments were being made about her in the workplace, and that they did nothing. (DE 55 at 6.)

When considering a motion for summary judgment, the Court must construe all facts in a light most favorable to the non-moving party. That means the Court must draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. Taking this approach, the Court accepts as true, for purposes of considering summary judgment, that

Plaintiff informed her supervisors about the intolerable work conditions. That leaves as a triable issue whether the conditions were such that they would have compelled a reasonable person to resign.

**(3)** *Intentional Infliction of Emotional Distress*

To succeed on a claim for the intentional infliction of emotional distress, a plaintiff must show that the Defendant's conduct was so "extreme" and "outrageous . . . as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002) (quoting Restatement (Second) of Torts § 46 (1965)). There are two routes available to Plaintiff here. Plaintiff may prove that Defendant itself acted outrageously, that is "beyond all possible bounds of decency." *See Holbrook v. Lobdell-Emery Mfg. Co.*, 219 F.3d 598, 601 (7th Cir. 2000). Alternatively, Plaintiff may attempt to prove that Defendant is vicariously liable for the action of one of its instruments who acted in such a manner, in this case Mr. Perez. *Id.* at 601.

In determining whether Defendant acted in a manner that would create an actionable claim of intentional infliction of emotional distress, *Holbrook* is particularly instructive. In that case, the plaintiff returned to work after a period of hospitalization for depression and psychosis. *Id.* at 600. Upon his return, he was subjected to harassment from co-workers and supervisors regarding his hospitalization. *Id.* The company refused to allow the plaintiff to work overtime on one occasion, and also denied his attempt to move into a new position. *Id.* Eventually, after engaging in a fist fight with a fellow employee, the plaintiff was fired. *Id.* The plaintiff worked in a union shop, but his union declined to pursue a grievance, finding that the termination was

14

appropriate. *Id.* Affirming the trial court's summary judgment ruling, the Court held that the refusal of overtime and the denial of a position change, the two actions the plaintiff attributed directly to his employer itself, did not meet the high standard for intentional infliction of emotional distress. *Id.* at 601.

In the present case, Plaintiff argues that the "conduct and indifference" of high-ranking supervisors at Whole Foods may be found by a reasonable trier of fact to meet the "extreme" and "outrageous" standards. (DE 55 at 14.) Plaintiff seemingly refers to Defendant's pace in administering final discipline to Mr. Perez, that is the lag time between Plaintiff's first complaint in January of 2004 and Mr. Perez's termination in October of 2005. Plaintiff also refers to the hostile environment fostered by supervisors, particularly Mr. Priest and Ms. Egan, subsequent to Mr. Perez's firing. Plaintiff claims that "Whole Foods did nothing to help prevent gossip and rumors about her after the sexual harassment," and that "Ms. Egan herself even advanced the rumors." (*Id.* at 13.) Plaintiff also claims that Mr. Priest was "short and ill-tempered with her, denying simple requests and refusing to answer her work-related questions." (*Id.*)

Even viewing the record in a light most favorable to Plaintiff, the non-moving party in this case, such indifference and conduct does not rise to the level of being "extreme" and "outrageous" as defined under Indiana law. According to *Holbrook*, acts can be "unthoughtful and boorish," as well as "unkind, cruel, and disheartening," but still not be the sorts of acts that the intentional infliction of emotional distress tort was created to remedy. *Holbrook*, 219 F.3d at 600. *Holbrook* also establishes that the employer must have "intended the injury or actually knew the injury would occur." *Id.* at 600. Defendant's actions in the instant case were not sufficiently extreme or outrageous. Defendant may have engaged in poor management practices,

15

and treated an employee unfairly, but a trier of fact could not reasonably come to the conclusion that Defendant engaged in "extreme" and "outrageous" behavior toward Plaintiff.

Plaintiff's argument that Defendant is vicariously liable for the actions of Mr. Perez is also unsuccessful. In a case like this one, "the employee is required to prove that the employer deliberately intended to inflict an injury or had actual knowledge that an injury is certain to occur." *Id.* at 601. "Thus, an intentional tort committed by a supervisor, manager, or foreman could subject that individual to tort liability but would not necessarily expose the employer to liability." *Id.* There are two ways in which a plaintiff may impute tortious intent to an employer on a *respondeat superior* basis. The employee must show either that "(1) the corporation is the tortfeasor's alter ego, or (2) the corporation has substituted its will for that of the individual who committed the tortious acts." *Perry v. Stitzer Buick GMC, Inc.*, 637 N.E.2d 1282, 1287 (Ind. 1994).

To prevail under the alter ego theory, the employee must show that both ownership and control of the corporation are in the tortfeasor's hands. *Holbrook*, 219 F.3d at 601. In *Holbrook*, supervisors criticized the quality and speed of the plaintiff's work upon his return from hospitalization, and one of them made a sexual remark to him about a female co-worker. *Id*. at 600. A superintendent called the plaintiff several derogatory, even vulgar, names. *Id.* Co-workers told the plaintiff he was "crazy" and "not right in the head," and spoke of his time in the hospital as time spent in the "nut house" and the "mental ward." *Id.* Co-workers hid his tools, spot glued his toolbox shut, and set fire to a rag in his back pocket. *Id.* The plaintiff contended that the company "knew of the situation and did nothing to stop it." *Id.* at 601. Regardless, the Court did not find that the actors, including multiple people in supervisory positions, owned or controlled

the corporation. *Id.* Neither, in the instant case, did Mr. Perez. No trier of fact could reasonably determine that he did.

The *Holbrook* court also found that knowing of the situation and doing nothing to stop it was not enough to show that the corporation had substituted its will for that of the individuals who had performed the tortious acts. *Id.* Proving such would require that the persons who injured the plaintiff were acting pursuant to a decision or policy made through the employer's regular decision-making channels by person's authorized to do so. *Id.* Plaintiff argues that Mr. Perez was acting "pursuant to Mr. Priest's policies or procedures." (DE 55 at 14.) This is not true. Mr. Perez was warned about his behavior on multiple occasions, and actually defied Mr. Priest's disciplinary warnings by continuing to engage in harassing behavior toward Plaintiff. While it is true that Mr. Perez was acting subsequent to instructions regarding his employer's policies and procedures, this is quite different than acting pursuant to them. No trier of fact could reasonably determine, given the facts as stated by Plaintiff, that Mr. Perez was carrying out the will of his employer by continuing to harass Plaintiff.

**(4)** *Negligent Infliction of Emotional Distress*

In her pleadings, Plaintiff argues that Defendant's "negligence directly and proximately caused significant emotional harm to the Plaintiff." (DE 1, Compl. ¶ 34.)

However, to prevail on a claim for negligent infliction of emotional distress under Indiana law, a plaintiff must satisfy the "modified impact rule." *Atlantic Coast Airlines v. Cook*, 857 N.E. 2d 989, 996-997 (Ind. 2006). Under that rule, a plaintiff must demonstrate a direct impact, which is defined as a physical impact, by the negligence of another and the plaintiff must

sustain an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person. *Powdertech*, 776 N.E.2d at 1263. Plaintiff in the present case cannot show a physical impact. Even if Plaintiff suffered emotional distress due to events at work, Indiana courts have specifically ruled that termination from employment does not satisfy the direct impact requirement. *Powdertech*, 776 N.E.2d at 1263.

Plaintiff meets none of the standards for a claim of negligent infliction of emotional distress, and no reasonable trier of fact could find otherwise.

**(5)** *Breach of Contract*

Plaintiff argues that Defendant violated the policies outlined in the sexual harassment section of the employee handbook, and that the employee handbook constituted a contract between employees and Whole Foods. (*Id.* at 7-8.)

However, employee manuals do not create employment contracts in Indiana. *Orr v. Westminster Vill. N., Inc.*, 689 N.E.2d 712, 717 (Ind. 1997). This is particularly true where the employment manual contains a disclaimer stating that the manual does not create a contract between the employer and the employee. *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000). The Whole Foods employee handbook contains just such a disclaimer, stating unequivocally that it is not a contract of employment. (DE 45 at 12.) Plaintiff signed several acknowledgments that she read and understood the terms of the Whole Foods employee handbook, including that she did not have a contract with Whole Foods. (*Id.* at 13.)

**E. Conclusion**

Defendant's Motion for Summary Judgment (DE 44) is granted in part and denied in part. Summary judgment is awarded, in favor of Defendant, on the state claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract. Summary judgment is denied on the federal claims of sexual harassment and retaliation.

So ORDERED August 4, 2010.

                 S/ Joseph S. Van Bokkelen
                 JOSEPH S. VAN BOKKELEN
                 UNITED STATES DISTRICT JUDGE